## IN THE UNITED STATES DISTRICT COURT FOR THE

## FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | Case No. 1:20-SW-993 |
| 14512 Piccolo Lane,  Apartment 103 Woodbridge, Virginia 22191 and a gray Chrysler Town and Country van bearing Virginia license plate VLC-1476 and VIN 2c4rc1hg5fr728255 | **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Francis Stoklosa, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant has been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since June of 2016.  Your Affiant is currently assigned to a squad that investigates violent gang and drug criminal enterprises out of the Northern Virginia Resident Agency of the Washington Field Office of the FBI.  Prior to joining the FBI, Your Affiant was employed by the Department of Defense ("DoD").  Your Affiant served in a variety of roles with DoD since 2003.

2.      As a Special Agent, Your Affiant is empowered under the statutory authority of Title 19, United States Code, Section 1589a and Title 8, United States Code, Section 1357.  Your Affiant is an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered to conduct investigations and to make arrests.

3.      While with the FBI, Your Affiant has investigated drug trafficking and gang-related activity, which resulted in the arrest of subjects, the seizure of property and assets, and the seizure of controlled substances.  As a result of my training and experience, Your Affiant is familiar with the

manner in which controlled substances are used and distributed.  Your Affiant has also become familiar with the methodology used in narcotics trafficking operations, as well as the unique trafficking patterns and language employed by drug dealers.  Prior to my current squad assignment Your Affiant had investigated counterterrorism matters.

4.      During my employment with the FBI, Your Affiant has also gained knowledge in the use of various investigative techniques, including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, the service of administrative subpoenas, and the execution of search and arrest warrants.

5.      Additionally, while serving in this capacity Your Affiant has become familiar with the practices and organizational structure of the transnational criminal organization *La Mara Salvatrucha* ("MS-13"), along with its subculture, terminology, indicia of gang membership, and use of telephonic communications and smartphone-accessible social media applications to communicate and recruit in furtherance of the criminal organization.

6.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses.  This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  All observations referenced in this Affidavit that Your Affiant did not personally make were relayed to me by the person(s) who made such observations or in reports that detailed the events described by those person(s).

7.      This Affidavit is being submitted for the limited purpose of an application for warrants to search: (1) 14512 Piccolo Lane, Apartment 103, Woodbridge Virginia 22191 and its curtilage

(hereinafter, the "**TARGET RESIDENCE"**), which is described more fully in Attachment A; and (2) a gray Chrysler Town and Country van bearing Virginia license plate VLC-1476 (which is registered to Glen Pudoc Padeway, whose Facebook account lists Andrea Renay PADEWAY **("PADEWAY")**, as his daughter, and VIN 2c4rc1hg5fr728255  (hereinafter, the "**TARGET VEHICLE**"), and to seize evidence, contraband, and instrumentalities of criminal activity—including possible violations of 21 U.S.C. §§ 841 (drug trafficking); 843(b) (use of a communication facility in committing controlled substances offenses); and 846 (conspiracy) and 18 U.S.C. §§ 521(c)(1) (criminal street gang participation); 922(g)(1) (felon in possession of a firearm); 924(c) (carrying a firearm in furtherance of drug trafficking); 1959(a)(3) (assault with a dangerous weapon in aid of racketeering); 1959(a)(4)(threatening to commit an act of violence in aid of racketeering)—that may be found therein. Because this Affidavit is being submitted for these limited purposes, Your Affiant has not set forth all of the information known to me concerning this investigation.  Instead, Your Affiant has set forth information that Your Affiant believes to be sufficient to establish probable cause for these warrants.

<u>**RELEVANT STATUTES**</u>

8.      21 U.S.C. § 841(a)(1) (drug trafficking) states that "it shall be unlawful for any person knowingly and intentionally—to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

9.      21 U.S.C. § 843(b)(use of a communication facility in committing controlled substances offenses) states that it "shall be unlawful for any person knowingly or intentionally to use any communication facility in committing" a controlled substances offense.

10.      21 U.S.C. § 846 (conspiracy) states that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those

3

prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

11.     18 U.S.C. § 521 (criminal street gang participation) states that it shall be an offense for an individual to "participate in a criminal street gang with knowledge that its members engage in or have engaged in a continuing series of offenses . . ."; "intends to promote or further the felonious activities of the criminal street gang or maintain or increase his or her position in the gang;" and "has been convicted within the past 5 years for" (A) a Federal felony involving a controlled substance for which the maximum penalty is not less than 5 years; or (B) a state offense involving a controlled substance for which the maximum penalty is not less than 5 years; or a state offense that is a felony crime of violence that has as an element the use or attempted use of physical force against the person of another; (C) any federal or State felony offense that by its nature involves a substantial risk that physical force against the person of another may be used in the course of committing the offense; or a conspiracy to commit an offense described in (A), (B), or (C).

12.     18 U.S.C. § 922(g)(1) states that "[i]t shall be unlawful for any person—who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; to possess a firearm."

13.     18 U.S.C. § 924(c)(i) (carrying a firearm in furtherance of drug trafficking) states that "any person who, during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such . . . drug trafficking crime—be sentence to a term of imprisonment of not less than 5 years."

14.     18 U.S.C. § 1959(a)(3) (assault with a dangerous weapon in aid of racketeering) states that whoever, "as consideration for the receipt of, or as consideration for a promise or agreement to pay,

4

anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . assaults with a dangerous weapon . . . any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished."

15.     18 U.S.C. § 1959(a)(4) (threatening to commit an act of violence in aid of racketeering) states that whoever, "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . threatens to commit an act of violence against . . . any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished."

## JURISDICTION

16.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711 and also 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense[s] being investigated."  18 U.S.C. § 2711(3)(A)(i).  Specifically, both the **TARGET RESIDENCE** and **TARGET VEHICLE** are located within the Easter District of Virginia.

## STATEMENT OF FACTS AND PROBABLE CAUSE

### MS-13 Background

17.     The FBI is conducting an investigation into the activities of the MS-13.  MS-13 originated in Los Angeles, California and has spread throughout the United States, Canada, Mexico, and Central America.  Based on my training and experience, Your Affiant knows that MS-13 members are required to commit acts of violence to further the interests of the gang.  These violent acts are often directed

against rival gang members, MS-13 members who have violated gang rules or otherwise disrespected the gang, and persons who are suspected of cooperating with law enforcement.  The FBI has developed evidence that members and associates of MS-13, including members of the Gangsters Locos Salvatruchas ("GLS") clique, among others, are involved in the possession and distribution of controlled substances and firearms, and the commission of violent crimes in aid of racketeering activity, while they operate in Loudoun County, Virginia and other places within the Eastern District of Virginia, and elsewhere.  Although their criminal activities are primarily concentrated in these areas, this clique's reach extends beyond these areas.

18.     During this investigation, as described below in the statements of INDIVIDUAL 1, an individual who is cooperating with the FBI who does not have charges pending, has not received payment from law enforcement, and whose statements have not been confirmed, investigators have learned that Vicente GOMEZ-Osegueda, aka "Triste," (**"GOMEZ")** is a high-ranking member of MS-13.  **GOMEZ** is known to be the "First Word," "boss," or leader of the GLS clique and holds the rank of a "Homeboy," in MS-13.  **GOMEZ** is a convicted felon, who, in 2013, was convicted of Unlawful Transport of Firearms, and, in 2008, was convicted of Prohibited Criminal Street Gang Participation. **GOMEZ** is a United States citizen.  **PADEWAY** is **GOMEZ's** wife and is also involved with his drug trafficking, as described below.  **PADEWAY** is a United States citizen.  Your Affiant knows through long-term surveillance that **GOMEZ** and **PADEWAY** reside at the **TARGET RESIDENCE** with several minor children, including a newborn baby.  Additionally, a public records check performed by your Affiant shows that **GOMEZ** resides at the **TARGET RESIDENCE**.  Further, on October 15, 2019, **PADEWAY** listed the **TARGET RESIDENCE** as her residence in a police report she submitted to the Prince William County Police Department regarding vandalism of her vehicle, the **TARGET**

**VEHICLE**.  Edwin GUTIERREZ-Sanchez, aka "Wasson," ("**GUTIERREZ**") is known to be a GLS member holding the rank of either *observacion* or *paro* as further described below.  Your Affiant has checked **GUTIERREZ's** status with U.S. Immigration and Customs Enforcement and **GUTIERREZ** is a citizen of El Salvador and is in the United States illegally.

### Terminology and traditional roles associated with MS-13 membership

19.     Based on my training and experience, Your Affiant knows that MS-13 members and associates use certain terms to describe the organizational structure of and certain positions within the gang, including but not limited to the following:

20.     ***Observacion*** – an observer.  A person who is in the process of gaining the trust of an MS-13 clique and is being observed and evaluated for membership by the MS-13 clique.  An observacion is often given discrete tasks like running errands, criminal or non-criminal in nature, for MS-13 homeboys.  Depending on the MS-13 clique's view of the individual's reliability and trustworthiness, an observacion may be promoted to being a *paro*.

21.     ***Paro*** – a helper.  A person who watches out for police presence (lookout in the neighborhood), makes deliveries of narcotics, drives homeboys around, delivers messages, and offers other minor assistance to the gang.  A paro does not typically know gang rules or take any part in clique meetings.  A paro could rise to a "chequeo."  A ***paro firme*** is a more established paro who has not yet risen to the next rank.

22.     ***Chequeo*** – a prospect.  A person who is allowed to know some rules, acts as a lookout during clique and general meetings (referred to as misas), sells narcotics for the gang, helps to recruit paros, assists homeboys with gang business and illicit activities, and is actively being "walked" or trained

7

by a senior homeboy.  This is a level a person has before they are given a 13 second beating to be "jumped" into the gang and become a "homeboy."

23.     ***Homeboy*** – A full member.  A person who has been "jumped-in" to the gang because they have proven their loyalty and worth to homeboys.  Homeboys received approval from the first word to jump-in a chequeo into a homeboy as a result of their work for the gang – they distributed narcotics, participated in gang violence, or other means of proving their worth to the gang.  Some cliques require that a chequeo kill a rival gang member or an MS-13 member suspected of cooperating with law enforcement authorities in order to earn their jump-in to become a homeboy.

24.     ***First Word*** – a homeboy who is in command of a clique.

## Controlled Buys

25.     Between February 14, 2020, and July 18, 2020, law enforcement authorities conducted eight controlled buys of cocaine from **GOMEZ** and/or **GUTIERREZ**.  Most of the controlled buys involved the **TARGET RESIDENCE** and the **TARGET VEHICLE**.  The first three buys were conducted by the Loudoun County Sheriff's Office ("LCSO") and the subsequent five buys were conducted by LCSO working with the FBI.  Each of these controlled buys involved a confidential informant ("CI"), who has provided reliable information to the LCSO on a number of occasions, which information has been corroborated by other sources of evidence including other witnesses and documentary evidence.  The CI is facing criminal charges unrelated to **GOMEZ**, **PADEWAY**, or **GUTIERREZ**.  Additionally, the CI has received payments for participating in the controlled buys.

## First Controlled Buy – February 14, 2020

26.     On February 14, 2020, the CI, following instructions from an LCSO detective contacted **GOMEZ** on SUBJECT PHONE 1 number and arranged the purchase of one ounce of cocaine from

GOMEZ.  **GOMEZ** told the CI that the price for the cocaine was $1,400.00.  The detective met with the CI at a predetermined location where the CI and the CI's vehicle were searched.  No monies or illegal items were found.  The CI was then provided with $1,400.00 of confidential funds and outfitted with an audio recording and transmitting device to capture the CI's conversation with **GOMEZ**.  The CI was then followed to the area of 22330 Sterling Boulevard (Harbor Freight parking lot) located in Loudoun County, Virginia, in the Eastern District of Virginia.  Around 8:20 p.m., the **TARGET VEHICLE** pulled beside the CI's vehicle.

27.     The Loudoun County officers observed **GOMEZ** get out of the front driver seat of the van and a skinny Hispanic male, who was later identified as **GUTIERREZ**, get out of the back seat. **GOMEZ** and **GUTIERREZ** then approached the passenger side of the CI's vehicle.  After a brief conversation, **GOMEZ** and **GUTIERREZ** got back into the Chrysler van and drove away from the area. The CI was followed by LCSO officers to a pre-determined location where the CI provided the detective with a clear baggie containing a substance appearing to be cocaine.   The CI and the CI's vehicle were searched, no monies or illegal items were found, and the audio recording  and transmitting device was recovered.

28.     The CI stated that **GOMEZ** had handed the individual later identified as **GUTIERREZ** the cocaine and that **GUTIERREZ** then gave it to the CI.  The CI then gave **GUTIERREZ** the $1,400.00.  **GUTIERREZ** then gave the cash to **GOMEZ's** wife who was sitting in the front passenger seat of the van.  The CI was able to identify **GOMEZ's** wife as **PADEWAY** through a Virginia Department of Motor Vehicles ("DMV") picture that was shown to him. This audio of this incident was listened to by a Spanish-speaking LCSO officer as it happened and was recorded.  The officer confirmed that the CI's description of the incident was accurate.  LCSO officers captured the exterior of the incident

9

in a video recording.

29.     The suspected cocaine was weighed using a digital scale and showed a weight of approximately 28 grams, including the baggie.   The substance was field-tested using a Narcotics Analysis Reagent Kit (NARKII), Scott Reagent Modified by Sirchie, (hereinafter, "Field Test Kit") and the test indicated positive for cocaine.

30.     On February 26, 2020, LCSO detectives met with the CI to identify the Hispanic male from the February 14, 2020 deal.   The CI was shown a photograph of **GUTIERREZ** and asked if he recognized the person in the photograph.   The CI stated that this was the person with **GOMEZ** on February 14, 2020.   The CI also advised that recently he was sent a Friend Request via Facebook from **GUTIERREZ**.   The detectives reviewed the Facebook Friend Request which showed that the requestor's name was Edwin Stanley Gutierrez Sanchez.   Additionally, a detective reviewed the profile of Edwin Stanley Gutierrez Sanchez in Facebook and the profile pictures and other pictures posted in the Facebook account matched the individual observed by law enforcement with **GOMEZ** at the controlled buy.

### Second Controlled Buy – February 27, 2020

31.     On February 26, 2020, LCSO detectives met with the CI.   The CI again arranged the purchase of one ounce of cocaine from **GOMEZ** for $1,400.00 via a telephone call.   The CI's participation on this phone call was captured on video.   The CI called **GOMEZ** on SUBJECT PHONE 1.

32.     The following day, February 27, 2020, LCSO detectives met with the CI at a pre-determined location and searched the CI and the CI's vehicle and no monies or illegal items were observed.   The CI was then given $1,400.00 in confidential funds and outfitted with an audio recording and transmitting device.

10

33.     The CI was again followed to the area of 22330 Sterling Boulevard, in Loudoun County in the Eastern District of Virginia.  **GOMEZ** was observed by law enforcement parked in a white work van with "TDI" on the side of the van.  The CI drove into the parking lot and parked beside **GOMEZ's** vehicle.  **GOMEZ** was observed by law enforcement exiting the van and approaching the driver's side of the CI's vehicle.  After a brief conversation, **GOMEZ** was observed returning to his vehicle and driving off the lot.  The CI was then followed to a predetermined location where the CI provided a detective with a clear baggie containing a substance suspected of being cocaine.  The CI and the CI's vehicle were searched, no monies or illegal items were found, and the audio recording and transmitting device was recovered.

34.     The suspected cocaine was field-tested using a Field Test Kit, and tested positive for cocaine.  The cocaine was not weighed at this time.  The audio of this incident was listened to by a Spanish-speaking LCSO officer as it happened and was recorded.  The officer confirmed that the CI's description of the incident was accurate.  LCSO officers captured the exterior of the incident in a video recording.

### Third Controlled Buy – March 18, 2020

35.     On March 18, 2020, an LCSO detective asked the CI to contact **GOMEZ** to purchase another ounce of cocaine.  The CI stated that he contacted **GOMEZ** on SUBJECT PHONE 1 and set up a drug buy of one ounce of cocaine for $1,400.00.

36.     Later that day, the LCSO detective met the CI at a predetermined location where the CI's vehicle and person were searched.  No monies or illegal items were observed.  The CI was provided with $1,400.00 of confidential funds and outfitted with an audio recording and transmitting device.  The CI

11

was then followed by the detective to the parking lot of a Home Depot in Chantilly, Virginia, in the Eastern District of Virginia.

37.     **GOMEZ** was observed pulling into the same parking lot driving the **TARGET VEHICLE**.  **GOMEZ** was the driver and **PADEWAY** was observed in the front passenger seat with several children in the back of the van.

38.     **GOMEZ** parked on the driver's side of the CI's vehicle.  **GOMEZ** then exited his van and talked to the CI who was sitting in the driver's seat of the CI's vehicle.  Law enforcement observed a hand-to-hand exchange between **GOMEZ** and the CI.  **GOMEZ** was then observed by law enforcement walking to the back of the CI's vehicle and urinating in the parking lot.  **GOMEZ** then returned to the CI and continued a conversation with the CI before returning to the driver's seat of his van.  **GOMEZ** then left the area.

39.     The CI was followed to a predetermined location where the CI provided the detective with a clear baggie containing white powder suspected to be cocaine.  The CI and the CI's vehicle were searched, no monies or illegal items were found, and the audio recording and transmitting device was recovered.  The CI stated that **GOMEZ** arrived driving a gray van, with his wife, **PADEWAY**, and children inside the van.  The CI said that **GOMEZ** got out of the van and they exchanged the money the detective had given the CI for the cocaine.  The CI said that the CI and **GOMEZ** had a brief conversation about work and then **GOMEZ** returned to his van and left.

40.     The audio of this incident was listened to by a Spanish-speaking LCSO officer as it happened and was recorded.  The officer confirmed that the CI's description of the incident was accurate.  LCSO officers captured the exterior of the incident in a video recording.

41.     The suspected cocaine was field-tested using a Field Test Kit.  The test indicated positive for cocaine.  The suspected cocaine was weighed using a digital scale and with the baggie it was in weighed approximately 28 grams.

### Fourth Controlled Buy – April 10, 2020

42.     On April 10, 2020, LCSO detectives working with FBI special agents, including Your Affiant, conducted a fourth controlled buy from **GOMEZ**.   A LCSO detective contacted the CI and asked the CI to arrange to buy one ounce of cocaine from **GOMEZ** for the usual price of $1,400.00. The CI informed the detective that the arrangement was agreed on by **GOMEZ**.  The CI subsequently told the detective that the CI contacted **GOMEZ** on SUBJECT PHONE 1 to arrange the buy.

43.     The detective met with the CI and the CI and the CI's vehicle were searched and no monies or illegal items were found.  The CI was provided with $1,400.00 of confidential funds and outfitted with an audio recording and transmitting device.  The CI was followed by law enforcement to the area of the **TARGET RESIDENCE**, **GOMEZ** and **PADEWAY's** residence, where the CI waited for **GOMEZ** to arrive.   **GOMEZ** was observed by law enforcement arriving in the **TARGET VEHICLE**.  Inside the van were **GOMEZ**, **PADEWAY**, several children, and **GUTIERREZ**.  Law enforcement then observed the CI, **GOMEZ**, and **GUTIERREZ** talking in the parking lot in front of **GOMEZ's** residence.  After a brief conversation, the CI returned to the CI's vehicle and **GOMEZ**, **GUTIERREZ**, and a child got into the gray van and exited the area.  **GOMEZ** was followed to another location.  **GOMEZ** did not take the most direct route to this location from his residence.  Surveillance was unable to maintain direct observation in this area.  After about 15 minutes, law enforcement followed **GOMEZ's** van back to the area of his residence.

44.     A LCSO detective subsequently met with the CI at a predetermined area and the CI

13

provided the detective with a clear Ziploc baggie containing another clear baggie that was tied and a small clear baggie with a green dollar symbol of suspected cocaine.  The CI and the CI's vehicle were searched, no monies or illegal items were found, and the audio recording and transmitting device was recovered.

45.     The CI, in describing what had just occurred, stated to the detective that **GOMEZ**, his wife (**PADEWAY**), **GUTIERREZ**, and the children arrived in **GOMEZ's** gray van.  The CI asked **GOMEZ** about buying more cocaine and better quality cocaine and **GOMEZ** told the CI that better quality cocaine would cost $1,700.00.  The CI also asked about purchasing a gun and **GOMEZ** told the CI that **GOMEZ** would let the CI know the price later.  The CI stated that **GOMEZ** mentioned that his cocaine source was an older guy and that he was leaving after the deal to give this guy the money.  The CI said that **GUTIERREZ** went to the CI's vehicle and retrieved the buy money and left the cocaine in the CI's vehicle.

46.     The audio of this incident was listened to by a Spanish-speaking LCSO officer as it happened and was recorded.  The officer confirmed that the CI's description of the incident was accurate.  LCSO officers captured the exterior of the incident in a video recording.

47.     The suspected cocaine in the larger baggie was field-tested using a Field Test Kit and tested positive for cocaine.  The cocaine was not weighed at this time.

### Fifth Controlled Buy – May 5, 2020

48.     On May 5, 2020, a LCSO detective instructed the CI to arrange a purchase of one ounce of cocaine from **GOMEZ**.  The CI advised the detective that the deal was arranged for $1,400.00.  The CI told the detective that the CI contacted **GOMEZ** on SUBJECT PHONE 1 to set up the deal.  Your Affiant provided the detective with $1,400.00 for the controlled purchase of the cocaine.

14

49.     The CI called the detective and stated that **GOMEZ** had told the CI that he was leaving his residence to get the cocaine.  The CI advised that **GOMEZ** now wanted $1,500.00 for the cocaine.

50.     Law enforcement subsequently established surveillance on **GOMEZ** who was observed exiting the **TARGET RESIDENCE**.  **GOMEZ** was driving the **TARGET VEHICLE**, which he had previously used in distributing cocaine.  **PADEWAY** was in the front seat of the van and **GUTIERREZ** was in the back with several children.  The van was followed to XXXXX Langstone Drive in Woodbridge, Virginia, the residence of **GOMEZ's** brother ("**GOMEZ's** brother's house").

51.     The detective met with the CI at a predetermined location and the CI's person and vehicle were searched and no monies or illegal items were found.  The CI was provided with $1,500.00 for the purchase of one ounce of cocaine from **GOMEZ** and outfitted the CI with an audio recording and transmitting device.

52.     **GOMEZ** was observed leaving **GOMEZ's** brother's house by law enforcement.  The CI was followed to the area of the **TARGET RESIDENCE**, shortly after **GOMEZ** arrived back at his residence with those he had previously been observed leaving with.  These individuals and the CI then entered the residence through the sliding glass door.  After a brief conversation, the CI exited the residence and was followed to a predetermined location.  The CI provided the detective with a clear baggie containing suspected cocaine.  The CI and the CI's vehicle were searched, no monies or illegal items were found, and the audio recording and transmitting device was recovered.

53.     The CI stated that when **GOMEZ**, **GUTIERREZ**, **PADEWAY**, and the children entered the residence, **PADEWAY** went to the back area of the apartment with the children.  The CI said that **GOMEZ** and **GUTIERREZ** stayed in the living room area where they talked.  **GUTIERREZ** provided the CI with the suspected cocaine and the CI then gave the $1,500.00 to **GOMEZ**.  The CI stated that

15

**GUTIERREZ** had the cocaine in his pocket.

54.     The audio of this incident was listened to by a Spanish-speaking LCSO officer as it happened and was recorded.  The officer confirmed that the CI's description of the incident was accurate. LCSO officers captured the exterior of the incident in a video recording.

55.     The suspected cocaine was field-tested using a Field Test Kit and tested positive for cocaine.  The cocaine was not weighed at this time.

### PADEWAY's and GOMEZ's Facebook Contact with the CI – June 6, 2020 and June 9, 2020

56.     On June 6, 2020, **PADEWAY** contacted the CI on a Facebook Video Chat and they spoke for approximately six minutes.  The CI told a LCSO detective that **PADEWAY** said she was reaching out on behalf of **GOMEZ** and told the CI that she had cocaine for him: 28 grams for $1,600.00.  The CI asked **PADEWAY** why the price was more than the usual price and **PADEWAY** told him that she needed to make money.  The CI spoke with **GOMEZ** via a Facebook Audio Call on June 9, 2020.  The CI said that **GOMEZ** told the CI that there had been a misunderstanding but that he had the product now if the CI could come get it.  The CI provided the detective with a screen shot of the Video Chat with **PADEWAY** on June 6, 2020, which Your Affiant has reviewed.  The CI also provided the detective with a screen shot of the CI's Facebook Audio Call log with **GOMEZ**, which shows that the CI and **GOMEZ** had an Audio Call on June 9, 2020.  Your Affiant has reviewed this screen shot also.

### Sixth Controlled Buy – June 17, 2020

57.     On June 16, 2020, law enforcement met with the CI to coordinate a sixth controlled buy of cocaine from **GOMEZ**.  The CI text messaged **GOMEZ** through Facebook Messenger.  The CI's messages said, "What's up fool," and "Q pedo pa manana me vas a tener la onda."  Your Affiant reviewed the second message with an FBI Special Agent who speaks Spanish and it translates roughly

to: "What's up for tomorrow, you going to have that thing?"  After the CI sent this message, **GOMEZ** called the CI on a Facebook Audio Call.  After a brief conversation with **GOMEZ**, the CI informed law enforcement that **GOMEZ** was going to call his source of supply to find out the price for the cocaine.  After a few minutes, **GOMEZ** called the CI back using Facebook and had a short conversation with the CI.  The CI informed law enforcement that **GOMEZ** said the price for an ounce of cocaine was $1,650.00 and that **GOMEZ** could have the product for the CI by the following afternoon.

58.    On June 17, 2020, your Affiant provided LCSO detectives with $1,600.00 for the controlled buy and an LCSO detective provided an additional $50.00 in funds.  All of this money was photographed by law enforcement.  An LCSO detective met with the CI at a prearranged location.  The CI and the CI's vehicle were searched and no money or illegal items were located.  The CI was given the funds for the purchase of one ounce of cocaine and outfitted with a recording device.  The CI was then followed to the area of the **TARGET RESIDENCE**.  The CI was observed exiting his vehicle and entering apartment #103 through a sliding glass door.  Approximately twenty minutes later, the CI was observed exiting the address through the sliding glass door.  The CI was then followed to a predetermined location where the CI provided law enforcement with a clear plastic baggie containing suspected cocaine.  The CI and the CI's vehicle were searched, no monies or illegal items were found, and the audio recording and transmitting device was recovered.

59.    The CI stated that **GOMEZ** handed him the cocaine and took the money.  The CI saw **GOMEZ** and **PADEWAY** inside the **TARGET RESIDENCE** with several children.  The CI stated that **GOMEZ** had mentioned that his source for the cocaine had wanted $1,750.00 but that **GOMEZ** talked him down.  **GOMEZ** also inquired why it was taking the CI so long to sell the cocaine.  **GOMEZ** then mentioned in Manassas, Virginia by a 7-11 convenience store where the CI could sell the cocaine

faster.  The CI stated that **GOMEZ** said that MS-13 is there and sometimes the 18th Street Gang and they are all selling, and the CI could sell out the cocaine in just a few days.

60.     The audio of this incident was listened to by a Spanish-speaking LCSO officer as it happened and was recorded.  The officer confirmed that the CI's description of the incident was accurate.  LCSO officers captured the exterior of the incident in a video recording.

61.     The suspected cocaine was field-tested using a Field Test Kit and tested positive for cocaine.  The suspected cocaine was weighed using a digital scale and it weighed 28.5 grams including the baggie.

**Seventh Controlled Buy – July 2, 2020**

62.     On July 1, 2020, LCSO detective instructed the CI to arrange to buy one ounce of cocaine from **GOMEZ**.  The CI contacted **GOMEZ** and stated that **GOMEZ** had agreed to sell an ounce of cocaine from $1,650.00 the next day.  The CI stated that all communication about the deal had been conducted via Facebook.

63.     On July 2, 2020, law enforcement, including the FBI, were briefed on the operation.  An FBI Special Agent provided a LCSO detective with $1,650.00 for the purchase of the cocaine.  This detective then met with the CI at a prearranged location.  The CI's person and vehicle were searched and no monies or illegal items were found.  The CI was provided with the money and outfitted with the audio recording and transmitting device.  The CI was then followed by law enforcement to the area of Piccolo Lane in Woodridge, Virginia.  The CI was observed entering the **TARGET RESIDENCE**.  After a short period of time, the CI was observed exiting the **TARGET RESIDENCE** and returning to the CI's vehicle.  The CI was then followed from the area to a predetermined location.  The CI provided the detective with a clear plastic baggie containing suspected cocaine.  The CI and the CI's vehicle were

searched, no monies or illegal items were found, and the audio recording device was recovered.

64.     The CI stated that when the CI arrived at the **TARGET RESIDENCE**, **GUTIERREZ** opened the sliding glass door and let the CI in.  **GUTIERREZ** was using a cell phone and Facebook's video streaming service to speak with **GOMEZ**.  **GOMEZ** stated to the CI through the video stream that he was in Winchester, Virginia with his brother working on his brother's car.  The CI stated that **GUTIERREZ** was sitting on the couch with the baggie of cocaine and counting the money the CI provided him.  The CI said that during the time the CI was using **GUTIERREZ's** phone and was Facebook streaming with **GOMEZ**.  The CI stated that **GOMEZ** and the CI talked about **GOMEZ** providing a gun to the CI.  **GOMEZ** stated that he was looking for a gun for the CI and in meanwhile if the CI had any problems to give him a call and he would help him.  The CI stated that **GUTIERREZ's** nickname was "Wasson" and was given his cell phone number while there.  The CI stated that **GUTIERREZ** was the only person in the residence during this incident.

65.     The audio of this incident was listened to by a Spanish-speaking LCSO officer as it happened and was recorded.  The officer confirmed that the CI's description of the incident was accurate.  LCSO officers captured the exterior of the incident in a video recording.

66.     The suspected cocaine was field-tested using a Field Test Kit and tested positive for cocaine.  Using a digital scale the suspected cocaine with baggie weighed approximately 24 grams.

**Eighth Controlled Buy – July 16, 2020**

67.     On July 14, 2020, **GOMEZ** contacted the CI via Facebook Messenger and inquired whether the CI was interested in purchasing cocaine.  On July 15, 2020, at approximately 3:45 p.m., the CI met a Loudoun County detective at a predetermined location in Loudoun County, Virginia to discuss a plan to purchase two ounces of cocaine from **GOMEZ** the following day.  The CI used Facebook

Messenger to contact **GOMEZ** and a short time later the CI received a call through Facebook from **GOMEZ**.  The CI subsequently received another call from **GOMEZ** and set up the deal for late afternoon on July 16, 2020, at the **TARGET RESIDENCE** and established that the price per ounce of the cocaine would be $1,650.00.  The CI briefly mentioned the purchase of a firearm to **GOMEZ** and **GOMEZ** responded that he did not currently have any firearms to sell the CI.  However, **GOMEZ** stated that he knew of an individual who would be traveling "down state" in the near future to purchase some firearms to bring back and that **GOMEZ** may be able to sell firearms to the CI when the individual returned.

68.      On July 16, 2020, the CI advised a LCSO detective that **GOMEZ** had contacted the CI and advised that **GOMEZ** would have to do the deal at a hospital in the Eastern District of Virginia because **GOMEZ's** wife (**PADEWAY**) was due to give birth that day.  The detective, after coordinating with law enforcement partners, advised the CI to tell **GOMEZ** that the CI would meet him at the hospital.

69.      Law enforcement, including the FBI, met at a predetermined location near the hospital.  Your Affiant provided $3,300.00 to a detective for the controlled buy.  Your Affiant had photographed this money prior to issuance to the detective.  The detective then met with the CI at a predetermined location nearby.  The CI had advised the detective via telephone that **GOMEZ** had requested that the CI pull into the entrance to the hospital where the women's hospital was located.  Upon meeting with the CI, the detective searched the CI's person and vehicle thoroughly and did not locate any unauthorized or illegal items.  The CI was provided with the $3300.00 and outfitted with an audio recording and transmitting device.

70.      The CI was then followed to the hospital entrance area where the CI pulled into the public drop-off area.  Surveillance units were able to keep a constant eye on the CI and the CI's vehicle.  A

20

short time later, a male subject, visually identified by law enforcement as **GOMEZ**, exited the hospital doors and walked to the CI's vehicle.  The LCSO detective was able to monitor the event via live surveillance camera footage.  A conversation occurred between the CI and **GOMEZ**.  The conversation was translated from Spanish to English by an LCSO's detective who is fluent in Spanish.  **GOMEZ** stated that he was still attempting to locate a firearm to sell to the CI.  He also asked the CI several questions pertaining to firearms, including what kind of firearm the CI was looking for.  After this interaction, **GOMEZ** exited the vehicle and walked back into the hospital.

71.     The CI was then followed away from the hospital to a predetermined staging area.  The CI provided law enforcement with two clear plastic baggies containing a white powdery substance suspected of being cocaine.  The CI and the CI's vehicle were searched, no monies or illegal items were found, and the audio recording and transmitting device was recovered.   The CI advised of the conversation about firearms and purchasing a firearm from **GOMEZ**.

72.     The audio of this incident was listened to by a Spanish-speaking LCSO officer as it happened and was recorded.  The officer confirmed that the CI's description of the incident was accurate.  LCSO officers captured the exterior of the incident in a video recording.

73.     The suspected cocaine was field-tested using a Field Test Kit and the contents of both baggies tested positive for cocaine.

74.     A digital scale was used to weigh each baggie.  Each baggie weighed out to approximately 29.74 grams.

### Firearms and Tools of Drug Trafficking

75.     Based on my training and experience, drug traffickers often have firearms to protect their drugs and drug proceeds.  Additionally, drug traffickers, especially traffickers who distribute from their

residences, frequently maintain firearms in their residences.

76.     On April 8, 2020, Your Affiant visited a firearms store in Woodbridge, Virginia (hereinafter "Firearms Store"). Staff at the Firearms Store provided Your Affiant with documents related to firearms purchases by **PADEWAY** and **GOMEZ's** brother.

77.     Regarding **PADEWAY**, the Firearms Store provided firearms transactions records, including ATF Form 4473, for **PADEWAY's** purchase of a Glock, Model G48, 9mm pistol. The Firearms Store also provided a sales receipt, dated March 26, 2020, for **PADEWAY's** purchase of a Glock, Model G48 with two ten round magazines, 9mm ammunition, 5.7x28mm ammunition, a right-handed holster for a Glock, Model 48, and a magazine for 5.56mm and .223 caliber ammunition. On the ATF Form 4473, dated March 25, 2020, **PADEWAY** listed her current address as the same address as **GOMEZ's** brother's house with one number missing from the beginning of the street number (It is possible that this missing number was cut off the left edge of the page when the form was photocopied). Your Affiant notes that a criminal history check on **PADEWAY** returned a Virginia driver's license for **PADEWAY** that listed **GOMEZ's** brother's house as her home address. However, as noted above, **PADEWAY** provided the **TARGET RESIDENCE** as her home address in a police report on October 15, 2019, and law enforcement surveillance has observed her appearing to live at the **TARGET RESIDENCE**, not **GOMEZ's** brother's address, during the course of this investigation. On the first page of ATF Form 4473, above **PADEWAY's** signature, is the statement that "I understand that the making of a false statement on this form and/or the corresponding federal form is punishable as a felony." *See* ATF F 4473 (*available at*: https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download). Based on my training and experience, Your Affiant knows that individuals who live with convicted felons often seek to obscure their true home address

because they believe they may not be able to pass a firearms background check attendant to the purchase of a firearm if it is revealed that they are living with a felon.

78.     Regarding **GOMEZ's** brother, the Firearms Store provided firearms transactions records, including ATF Form 4473, dated March 25, 2020 (the same date as on **PADEWAY's** form), for **GOMEZ's** brother's purchase of a Lewis Machine & Tool ("LMT") Defender 2000, 5.56x45mm rifle, bearing serial number LMT 67976.  The Firearms Store also provided a sales receipt, dated July 20, 2019, for **GOMEZ's** brother's purchase of a FN Five-Seven MKII 5.7x28mm with three (3) twenty round magazines, and 5.7x28mm ammunition.  On the ATF Form 4473, **GOMEZ's** brother listed his current address as the address listed above as **GOMEZ's** brother's address.  Your Affiant notes that **PADEWAY**, as described above, bought a magazine for 5.56mm and .223 caliber ammunition, which could be used in the LMT Defender 2000, and bought 5.7x28mm ammunition which could be used in the FN Five-Seven MKII.

79.     Based on my training and experience, Your Affiant knows that individuals involved with narcotics trafficking and violent criminal organization, such as the MS-13, frequently use straw purchasers to buy firearms for them and then purchase ammunition and magazines, which do not require background checks, for these firearms.  This is even more frequent when individuals, such as **GOMEZ**, have prior felony convictions, or individuals, such as **GUTIERREZ**, do not have legal status, which prevent them from legally purchasing or possession firearms.  Additionally, Your Affiant knows from training and experience that MS-13 members and associates often share firearms.

### Statements by INDIVIDUAL 1 on August 2, 2020

80.     **GOMEZ and GUTIERREZ's roles in MS-13:** On August 2, 2020, Your Affiant interviewed Individual 1, an individual who identified himself as a "paro firme" in the Gangster's Locos

Salvaturchas clique of MS-13.  This interview was not a custodial interview and Individual 1 was not *Mirandized.*  Individual 1 stated he had been part of the clique for approximately two years.  He also stated that **GOMEZ** was a homeboy and the boss or leader of GLS.   Further, he stated that **GUTIERREZ** was an observacion in the clique and was living with **GOMEZ** at the **TARGET RESIDENCE**.

81.    **MS-13 related assaults by GOMEZ**: Individual 1 stated that on July 27, 2020, **GOMEZ** repeatedly struck and strangled Individual 1 in the **TARGET RESIDENCE**, while **PADEWAY** watched, and then struck Individual 1 in a grey minivan, while **PADEWAY** was sitting in the back seat, before Individual 1 escaped.  Individual 1 stated that **GOMEZ** assaulted him because he had not been reporting to him as a member of MS-13 and demanded $100.00 from Individual 1 to send to an MS-13 member in El Salvador.  Individual 1 stated that **GOMEZ** was collecting this amount from other members of the clique to send to El Salvador.  Individual 1 stated that **GOMEZ** told Individual 1 that he was going to hit Individual 1 with a baseball bat at the **TARGET RESIDENCE**.  **GOMEZ** also threatened to kill Individual 1, Individual 1's family, and Individual 1's baby if Individual 1 did not comply with **GOMEZ's** MS-13 orders.  Additionally, **GOMEZ** stated that he would kill Individual 1 and Individual 1's family if Individual 1 spoke with anyone about what **GOMEZ** had done to Individual 1.  Law enforcement took photographs of Individual 1's face, neck, and upper chest to show injuries Individual 1 received from **GOMEZ**.

82.    Additionally, Individual 1 stated that **GOMEZ** had beaten Individual 1 with a baseball bat on two other occasions within approximately the past year.  In the first beating, **GOMEZ** hit Individual 1 three times with a baseball bat for not listening to his orders as an MS-13 leader.  In the second beating, **GOMEZ** hit Individual 1 six times with a baseball bat for not reporting to him as an